2010 Ark. 195

**Barry JEWELL, Appellant,**

**v.**

**Scott FLETCHER, Appellee/Cross–Appellant,**

**Debra Worley, as Special Administrator of the Estate of Micheal D. Sims, Cross–Appellant/Cross–Appellee,**

**Keith Moser; Jewell, Moser, Fletcher & Holleman, a Professional Association; JMF Enterprises, Inc., Appellees,**

**John T. Holleman, IV; and Holleman & Associates, P.A., Intervenors/Appellees.**

No. 09–313.

Supreme Court of Arkansas.

April 29, 2010.

Rehearing Denied June 3, 2010.

Shelly Lynn Hogan, Little Rock, for Appellant.

David M. Donovan, Edward Thomas Oglesby, Joel Franklin Hoover, Elizabeth C. Abney, Ashley D. Peoples, Little Rock, for Appellee.

DONALD L. CORBIN, Justice.

This is an appeal from an order of the Pulaski County Circuit Court entered on December 9, 2008, in the course of a judicial-dissolution proceeding. Appellant Barry Jewell appeals that part of the order denying his motion to vacate a judgment entered in favor of his former law partner, Appellee/Cross–Appellant Scott Fletcher. Debra Worley, as Special Administrator of the Estate of Micheal D. Sims,[1] filed a cross-appeal from that part of the order approving the claim filed by Sims in the dissolution action but rejecting his request to order an unwinding of previous distributions in order to satisfy his claim. Fletcher also cross-appeals that part of the order approving Sims's claim, arguing that no proof was submitted to support the claim. Because this is a subsequent appeal, our jurisdiction is pursuant to Ark. Sup.Ct. R. 1–2(a)(7) (2009). As to Jewell, we affirm. As to Sims, we reverse and remand, and we affirm on Fletcher's cross-appeal.

This is the third time that this court has had proceedings stemming from the judicial dissolution of the law firm of Jewell, Moser, Fletcher & Holleman, P.A. (JMFH). The underlying facts that precipitated this lengthy litigation were set forth in detail by this court in *Sims v. Fletcher*, 368 Ark. 178, 243 S.W.3d 863

(2006), part of which can be summarized as follows:

Jewell, a shareholder in JMFH, filed a complaint seeking judicial dissolution and an accounting of JMFH's assets in Pulaski County Circuit Court on June 19, 2003, alleging that the members of the firm stopped practicing law together on or about August 31, 2002, but continued to collect receivables owed to the firm. Fletcher, also a shareholder at one time, filed a counterclaim against Jewell on July 16, 2003, asserting causes of action for breach of contract, unjust enrichment, breach of fiduciary duty, defamation, intentional destruction of property, fraud, and negligence. Moser, also a shareholder, filed a motion to dismiss Jewell's complaint pursuant to Ark. R. Civ. P. 12(b)(6). In response to Fletcher's counterclaim and Moser's motion to dismiss, Jewell filed a motion for summary judgment, asserting that Moser had lost his license to practice law and was no longer a shareholder in JMFH and that Fletcher was also no longer a shareholder and, thus, neither party had standing to challenge the dissolution. The court entered an order on September 22, 2004, granting Jewell's motion for summary judgment as to the dissolution of JMFH. The trial court subsequently appointed Milas "Butch" Hale to serve as the receiver for JMFH pursuant to Ark.Code Ann. § 4–27–1432 (Repl.2001).

Following entry of the trial court's order with regard to dissolution, Holleman, the fourth shareholder of JMFH,

---

1. Mr. Sims was killed in an automobile collision on his way to the October 31, 2008 hearing in this matter. Although the Estate is now the proper party in this appeal, we will continue to refer to Mr. Sims as the appealing party for purposes of continuity with the prior appeals decided by this court. Moreover, although Mr. Sims filed a notice of cross-appeal after Mr. Jewell filed his notice of appeal, Mr. Sims's appeal is more in the nature of a direct appeal.

sought to intervene in the proceeding in order to seek salaries and benefits owed to him pursuant to his employment agreement with JMFH. The trial court granted Holleman's motion to intervene. Appellants also sought to intervene in this case in order to assert claims against JMFH, but the trial court determined that their interests would be adequately protected and that it was not appropriate for creditors to intervene in a judicial-dissolution proceeding.

As the dissolution proceeded, the trial court held a hearing on November 8, 2005, to begin adjudicating claims and to take testimony on what assets belonged to the firm, as opposed to individual shareholders. Hale presented the court with a list of claims filed to date and the trial court announced that as long as claims had been filed within the time period established by the receiver, it would allow creditors to amend or supplement claims if needed. The trial court then proceeded to hear testimony and take evidence with regard to what assets belonged to JMFH and what assets belonged to certain individuals, including whether certain fees collected by Holleman after the dissolution proceeding began were fees that belonged to JMFH or to Holleman and Holleman & Associates.

At the conclusion of the hearing, the court instructed the parties, including the creditors, to submit simultaneous briefs on the issues of what assets belong to JMFH and whether, under the receivership statutes, the shareholders had any standing to object to the receiver's recommendation regarding what claims should be accepted....

....

After the parties submitted their briefs, the trial court entered an order on December 29, 2005, finding that the effective date of JMFH's dissolution was July 25, 2002, and issuing orders that Jewell, Fletcher, and Holleman pay certain monies into the court's registry for fees that had been recovered on behalf of JMFH. In addition, the trial court ruled that a default judgment obtained by Sims in Lonoke County was void ab initio because the Lonoke County Circuit Court was divested of jurisdiction once the claim for judicial dissolution was filed in Pulaski County. Sims and the other creditors were given thirty days to file additional evidence supporting their claims against JMFH.

Following the submission of amended claims, the trial court entered an order allowing certain claims sought by Jewell, Fletcher, and Holleman, as well as a claim by creditor Betty Hoyt. Appellants' claims were summarily denied. They filed a joint motion for reconsideration or new trial, and requested the court to issue findings of fact and conclusions of law. The trial court never ruled on either motion, and the motions were subsequently deemed to be denied. No order was ever entered with regard to the causes of action brought by Fletcher in his counterclaim against Jewell.

*Id.* at 180–82, 243 S.W.3d at 864–65.

Sims and the other creditors appealed the circuit court's order to this court, but we dismissed the appeal for lack of a final order. *Sims*, 368 Ark. 178, 243 S.W.3d 863. At the time that Sims filed his direct appeal, he also filed a petition for certiorari or, alternatively, prohibition. *Sims v. Cir. Ct. of Pulaski County*, 368 Ark. 498, 247 S.W.3d 493 (2007). Therein, he requested, among other relief, that this court prohibit the circuit court from voiding the default judgment he obtained in Lonoke County. Sims also moved for a temporary stay to prohibit the circuit court from disbursing

any funds held in the court's registry as part of the dissolution proceeding, which this court granted. On January 18, 2007, we denied Sims's request for an extraordinary writ on the basis that he had an adequate remedy available in the nature of a direct appeal. *Id.* That same day, the circuit court entered an order directing the Pulaski County clerk to disburse the majority of funds held in the court's registry.

The circuit court subsequently held a hearing regarding Fletcher's counterclaim against Jewell and entered an order finding, in relevant part, that Fletcher was entitled to judgment against Jewell for office expenses incurred pursuant to an oral agreement between Fletcher and Jewell, in the principal amount of $49,095.15. This order was entered of record on August 1, 2007.

Once the final order was entered, the parties again appealed to this court. In *Sims v. Moser,* 373 Ark. 491, 284 S.W.3d 505 (2008), Sims argued that the circuit court erred in voiding the default judgment he had obtained in Lonoke County. Sims and the other appellants, who are no longer a part of this litigation, also argued that they were denied due process when the circuit court denied their claims without a hearing. This court agreed, explaining that the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Accordingly, we reversed and remanded the matter so that the claimants could present their claims at a meaningful hearing.[2] We did not, however, address Sims's request that we order the circuit court to unwind the previous distributions. Doing so would have required us to issue an advisory opinion as Sims's claim had not yet been approved, and this court will not issue advisory opinions. *Riceland Foods, Inc. v. Pearson,* 2009 Ark. 520, 357 S.W.3d 434.

Following remand, Jewell filed a motion to vacate the August 1, 2007 judgment entered against him in favor of Fletcher. Jewell argued that Fletcher had defrauded the court by testifying that he had never benefitted from any immunity agreements in the course of a federal investigation into Jewell and a pending federal indictment against him. According to Jewell, because their case came down to credibility, Fletcher's perjured testimony rendered the resulting judgment void.

Also on remand, Sims filed a bench memorandum arguing that because his claim was in the form of a judgment, it was not subject to a collateral attack. He further argued that because he was denied due process, he should not be placed at a disadvantage to those claimants who were afforded due process.[3] Sims requested that the circuit court approve his claim and order a refund of previously disbursed funds in an amount sufficient to pay that claim.

A hearing was held in circuit court on October 31, 2008. The court entered a written order on December 9, 2008, ruling relevant to this appeal, that: (1) Jewell's motion to vacate was denied; (2) Sims's claim against JMFH was approved in the amount of $683,757.05, an amount representing the default judgment, less $40,000 received by Sims from the Arkansas Supreme Court Client Security Fund,

---

2. In *Sims,* 373 Ark. 491, 284 S.W.3d 505, we also rejected Jewell's arguments on appeal that the circuit court erred in denying his motion for continuance or for a stay of Fletcher's counterclaim

3. Ultimately, the only claimants who received disbursements were the four shareholders of JMFH.

and less $16,740 that Sims's accounting showed applied to a judgment against Keith Moser, rather than a judgment against JMFH; (3) Sims's request to unwind the previous court orders disbursing funds to JMFH's shareholders was denied because Sims failed to obtain a stay of those judgments or post a supersedeas bond; and (4) Sims's request that JMFH's shareholders be required to refund previously awarded funds was also denied. This appeal followed.

### Jewell's Appeal

As his sole point on appeal, Jewell argues that the circuit court abused its discretion in denying his motion to vacate the judgment entered against him on August 1, 2007, and awarding Fletcher $49,095.15 for recoupment of office expenses. Specifically, Jewell argues that the order should be vacated pursuant to Ark. R. Civ. P. 60(c)(4) on the basis of Fletcher's purported fraud and misrepresentation. Fletcher counters that Jewell cannot establish the essential elements of fraud, particularly that the alleged misstatements were material and that the trial court relied on the false statement in ruling as it did.

We note at the outset that it is within the discretion of the circuit court to determine whether it has jurisdiction under Rule 60 to set aside a judgment, and the question on appeal becomes whether there has been an abuse of that discretion. *See New Holland Credit Co., LLC v. Hill,* 362 Ark. 329, 208 S.W.3d 191 (2005).

Rule 60(c) states in relevant part:

*(c) Grounds for Setting Aside Judgment, Other than Default Judgment, After Ninety Days.* The court in which a judgment, other than a default judgment [which may be set aside in accordance with Rule 55(c) ] has been rendered or order made shall have the power, after the expiration of ninety (90) days of the filing of said judgment with the clerk of the court, to vacate or modify such judgment or order:

. . . .

(4) For misrepresentation or fraud (whether heretofore denominated intrinsic or extrinsic) by an adverse party.

Ark. R. Civ. P. 60(c)(4) (2009). Thus, pursuant to Rule 60(c)(4), a judgment may be vacated more than ninety days after being filed with the clerk where there was misrepresentation or fraud.

Here, the allegations of fraud center around testimony given by Fletcher at the August 1, 2007 hearing concerning Fletcher's counterclaim against Jewell. Fletcher alleged that he had an oral contract with Jewell to share office expenses from September through December of 2002, with the men agreeing to split everything fifty-fifty. According to Fletcher, Jewell told him that it would take some time to accumulate enough cash flow to begin paying his half of the expenses. Fletcher stated that he agreed to pay all the expenses until the end of the year, at which time Jewell was to pay him back. Before the end of the year, however, the two began disagreeing about the amount Jewell owed. Fletcher claimed that Jewell owed him approximately $49,000, while Jewell believed he owed approximately $36,000.

On cross-examination, counsel for Jewell asked Fletcher if he had had any conversations with anyone from the U.S. Attorney's Office or the Department of Justice regarding Jewell and an ensuing federal investigation of him. He also asked Fletcher if he had any type of immunity agreements or other agreements with any law enforcement agencies to provide testimony against Jewell. Fletcher admitted that he had talked with certain people but

denied having any type of immunity agreements. The following colloquy ensued:

> [COUNSEL FOR JEWELL]: Do you have any sort of immunity agreement with any law enforcement agency?
>
> [FLETCHER]: No.
>
> [COUNSEL FOR JEWELL]: Do you have any understanding, either verbal or written, with any sort of law enforcement agency?
>
> [FLETCHER]: No.
>
> [COUNSEL FOR JEWELL]: Have you agreed with any law enforcement agency to provide testimony against Barry Jewell?
>
> [FLETCHER]: No.

Thereafter, Jewell, who was facing a pending federal indictment related to his association with JMFH, asserted his Fifth Amendment privilege against self-incrimination in response to questions from counsel for Fletcher. As previously mentioned, the circuit court ultimately entered an order awarding $49,095.15 to Fletcher on his counterclaim.

The federal case against Jewell proceeded to trial and during the course of this trial, Jewell learned that Fletcher did have certain agreements with federal authorities. Fletcher testified that he obtained a "Kastigar letter" in 2002 that provided that any statements Fletcher made during a proffer discussion regarding a criminal investigation by the Justice Department could not be offered by the government in its case-in-chief in a criminal prosecution of Fletcher. The second agreement was executed in 2006 and granted Fletcher use immunity $|_{10}$ in exchange for his proffer of information. It was this information that Jewell relied on in his motion to vacate pursuant to Rule 60(c)(4), arguing that it constituted fraud and misrepresentations perpetrated by Fletcher. The circuit court entered an order on December 9, 2008, denying the motion to vacate.

On appeal, Jewell asserts that the circuit court abused its discretion in denying the motion to vacate because the evidence he submitted established that Fletcher made a false representation of fact in denying the existence of any immunity agreements; that Fletcher knew the statements were false; that he made them in order to bolster his own credibility; and that the circuit court relied on Fletcher's misrepresentations. Thus, according to Jewell, Fletcher's credibility was of paramount importance to the circuit court's ruling, and Jewell was harmed because this evidence demonstrating Fletcher's bias against Jewell was excluded. Jewell further asserts that had he been allowed to explore this bias, the circuit court could have found that Fletcher's testimony was not credible and rejected it. To the contrary, Fletcher asserts that the circuit court did not abuse its discretion in denying Jewell's motion to vacate because his answers to Jewell's questions at the 2007 hearing were accurate and thus could not constitute fraud. Fletcher further asserts that he did not have immunity from prosecution for any of his acts or conduct; rather, the government agreed not to use specific statements against him.

In order to prove fraud, a plaintiff must prove five elements under Arkansas law: (1) that the defendant made a false representation of material fact; (2) that the defendant knew $|_{11}$ that the representation was false or that there was insufficient evidence upon which to make the representation; (3) that the defendant intended to induce action or inaction by the plaintiff in reliance upon the representation; (4) that the plaintiff justifiably relied on the representation; and (5) that the plaintiff suffered damage as a result of the false representation. *See Bomar v. Moser,* 369 Ark. 123, 251 S.W.3d 234 (2007). The

party seeking to set aside a judgment on the basis of fraud has the burden of proving fraud by clear, cogent, and convincing evidence, or, as our courts have sometimes said, clear, strong, and satisfactory proof. *Bullock v. Barnes*, 366 Ark. 444, 236 S.W.3d 498 (2006).

No judgment will be set aside, however, unless the defendant asserts a valid defense to the plaintiff's action in his or her motion and, upon hearing, makes a prima facie showing of such a defense. Ark. R. Civ. P. 60(d) (2009); *see also Hargis v. Hargis*, 292 Ark. 487, 731 S.W.2d 198 (1987) (holding that judgments will not be vacated unless a meritorious defense is alleged and proved). This court has defined a "meritorious defense" as the following:

> [E]vidence (not allegations) sufficient to justify the refusal to grant a directed verdict against the party required to show the meritorious defense. In other words, it is not necessary to prove a defense, but merely present sufficient defense evidence to justify a determination of the issue by a trier of fact.

*Martin v. Jetkins*, 320 Ark. 478, 479, 897 S.W.2d 567, 567 (1995) (quoting *Tucker v. Johnson*, 275 Ark. 61, 66, 628 S.W.2d 281, 283–84 (1982)).

Here, we simply cannot say that Jewell's allegation that Fletcher perjured himself is a valid defense to the action for breach of an oral contract. Even if we were to agree that Fletcher's testimony constituted fraud or misrepresentations, the asserted link between Fletcher's fraud and the court's entry of judgment on the oral contract is simply too tenuous to support a conclusion that Jewell established a prima facie showing of an affirmative defense to the breach-of-contract claim. Moreover, Jewell and Fletcher were embroiled in a heated judicial dissolution of their former law firm. It was no secret that there was animosity between the two men, and this was information known to the circuit court when it found Fletcher's testimony regarding the oral contract to be credible. Accordingly, the circuit court did not abuse its discretion in denying Jewell's motion to vacate.

## Sims's Appeal

■ We turn now to Sims's arguments. First, Sims argues that he was again denied his right to due process because upon remand the circuit court, while providing him with a hearing, failed to provide any meaningful opportunity to protect his rights. According to Sims, the October 31, 2008 hearing was meaningless with respect to his property rights and did not satisfy the requirements of due process. Fletcher and Holleman assert that Sims's argument is without merit, as he received a full and fair hearing on October 31, as evidenced by the fact that the circuit court approved Sims's claim. Moreover, they assert that Sims was not entitled to an unwinding of previous distributions because he had failed to seek or obtain a stay of enforcement of those orders or posted the necessary supersedeas bond prior to his previous appeal. We agree with Sims that he has again been denied due process.

■ The appropriate starting point for our analysis of Sims's due-process argument is this court's very discussion of due process in our decision from 2008, where we stated as follows:

> The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer great loss." It depends upon whether the interest in avoiding that loss outweighs the governmental interest in

summary adjudication. Thus, determining what process is due involves the consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Sims,* 373 Ark. at 499, 284 S.W.3d at 513 (citations omitted) (quoting *Tsann Kuen Enters. Co. v. Campbell,* 355 Ark. 110, 119–20, 129 S.W.3d 822, 827–28 (2003)). The key language here is that due process requires an opportunity to be heard at "a meaningful time and in a meaningful manner." *Id.* Similarly, this court stated that "[d]ue process requirements are satisfied if the property owner has reasonable notice and a reasonable opportunity to be heard and to present his claim or defense, or to protect and enforce his rights, before a tribunal having power to hear and rule his cause." *Davis v. Schimmel,* 252 Ark. 1201, 1208, 482 S.W.2d 785, 789 (1972) (citing *Dohany v. Rogers,* 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904 (1930)).

In the 2008 appeal, we analyzed the aforementioned requirement of due process and concluded:

> In examining the due-process factors, it is initially clear that appellants have a private interest in their personal property, here, their money. What is of specific interest here is the risk of an erroneous deprivation of the claimants' interests because they were not given the opportunity to be heard regarding their individual claims. Additionally, there are not additional or substitute procedural safeguards in this kind of a case because it involves the dissolution of JMFH. Once JMFH is completely dissolved and its assets are distributed, the creditors will no longer have a method to recoup JMFH's assets to pay their claims. Finally, there is no government interest present here that outweighed the importance of giving the individual claimants an opportunity to support their claims against JMFH before a final judgment was issued.

*Sims,* 373 Ark. at 500, 284 S.W.3d at 514. Our opinion was clear that Sims was entitled to a meaningful hearing, and although Sims was granted a hearing following our remand, the circuit court simply granted Sims's claim without any attempt to remedy the problem it caused in the first instance by depriving Sims of his right to due process. Holding a hearing after the funds had been distributed and subsequently failing to provide any mechanism for enforcing a valid claim does not comport with due process or with this court's holding in 2008. This court has noted that a circuit court should look beyond the words of reversal and look to the effect of the opinion in proceeding upon remand. *See Glover v. Woodhaven Homes, Inc.,* 346 Ark. 397, 57 S.W.3d 211 (2001) (quoting *Kneeland v. Am. Loan & Trust Co.,* 138 U.S. 509, 11 S.Ct. 426, 34 L.Ed. 1052 (1891)).

Sims states that there was approximately $2,746,813 in the court's registry prior to the disbursements stemming from the court's order on January 18, 2007. By the time of the hearing on October 31, 2008, however, there remained only $151 in the court's registry. According to Sims, in order for the October 31 hearing to be meaningful as required by the Due Process Clause, he had to have been afforded the opportunity to collect on his claim in the same manner, as if his rights had

never been violated in the first place. Sims further asserts that the circuit court placed an additional burden on him by requiring him to overcome the burden of seeking to have the prior distributions unwound.

The United States Supreme Court's decision in *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), is instructive on this point. There, the Supreme Court was presented with a situation wherein the Florida Supreme Court declared a tax to be unconstitutional and ordered prospective relief in the form of an injunction. The Florida Supreme Court, however, refused to order a refund of the illegally paid taxes. In reversing, the United States Supreme Court concluded that prospective relief, by itself, was an insufficient remedy. The Court stated as follows:

> If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation.

*Id.* at 31, 110 S.Ct. 2238 (footnotes omitted). Just as the state of Florida was required to provide some backward-looking relief to rectify an unconstitutional deprivation, so was the circuit court in this case. The circuit court's action of holding a hearing and summarily affirming Sims's claim, without providing a mechanism to enforce the subsequently approved claim, was not sufficient to satisfy the "meaningful" requirement of due process.

That leads us to the arguments raised by Fletcher and Holleman that Sims was not entitled to have the distributions unwound because he failed to obtain a stay or post a supersedeas bond. They raised this argument for the first time to the circuit court at the October 31, 2008 hearing. Consequently, while the circuit court approved Sims's claim, it refused to unwind the distributions or to order the shareholders to refund monies previously paid to them. Now, on appeal, Fletcher and Holleman assert that the circuit court correctly denied Sims's requested relief because of his failure to obtain a stay or post a bond prior to his previous appeal. Under the doctrine of law of the case, because Fletcher and Holleman failed to raise this argument to this court in the 2008 appeal, they were precluded from raising it to the circuit court on remand and, likewise, cannot now assert it as a basis for affirming the circuit court.

The doctrine of law of the case prohibits a court from reconsidering issues of law and fact that have already been decided on appeal. *McWhorter v. McWhorter*, 2009 Ark. 458, 344 S.W.3d 64; *Jones v. Double "D" Props.*, 357 Ark. 148, 161 S.W.3d 839 (2004). The doctrine provides that a decision of an appellate court establishes the law of the case for the circuit court upon remand and for the appellate court itself upon subsequent review. *See Jones*, 357 Ark. 148, 161 S.W.3d 839. The doctrine serves to effectuate efficiency and finality in the judicial process and its purpose is to maintain consistency and avoid reconsideration of matters once decided during the course of a single, continuing lawsuit. *See id.* It further provides that the decision of the first appeal becomes the law of the case, and is conclusive of every question of law or fact decided in the former appeal, and also of those which might have been, but were not, presented. *See Slaton v. Slaton*, 336 Ark. 211, 983 S.W.2d 951 (1999).

In the instant case, Fletcher and Holleman could have raised the issue of

Sims's action or inaction as to a stay or supersedeas bond to this court in the 2008 appeal. In his brief to this court in the 2008 appeal, Sims stated in his statement of the case that "[o]n January 18, 2007, the court entered an order for the disbursement of funds remaining in the court registry." Sims then argued that this court should reverse the circuit court's order disbursing the funds and asked that "the Pulaski County Circuit Court be ordered to collect the funds that have been distributed and re-distribute in accordance with that decision." And, then in his prayer for relief, Sims again asked this court to reverse the order of distribution. But, neither Fletcher nor Holleman argued in response that Sims was not entitled to such relief because of his failure to obtain a stay or post a bond. Thus, according to the doctrine of law of the case, where the argument could have been raised to this court in that 2008 appeal, but was not, that issue was improperly considered by the circuit court on remand and cannot form the basis for this court's affirmance on such grounds. *See id.* This is particularly true where the arguments now raised by Fletcher and Holleman regarding the stay and supersedeas bond are based on events that transpired prior to the circuit court's 2007 order disbursing the funds.

Even if we were to ignore this procedural defect, Fletcher and Holleman's arguments regarding the stay and supersedeas bond are without merit. Rule 62 of the Arkansas Rules of Civil Procedure, and Rule 8 of the Arkansas Rules of Appellate Procedure—Civil, govern supersedeas bonds. Rule 62(d) provides that, "[w]hen an appeal is taken, the appellant by giving a supersedeas bond may obtain a stay." Ark. R. Civ. P. 62(d) (2009). Appellate Rule 8(c) provides as follows:

> Whenever an appellant entitled thereto desires a stay on appeal, he shall present to the court for its approval a supersedeas bond which shall have such surety or sureties as the court requires. The bond shall be to the effect that appellant shall pay to appellee all costs and damages that shall be affirmed against appellant on appeal; or if appellant fails to prosecute the appeal to a final conclusion, or if such appeal shall for any cause be dismissed, that appellant shall satisfy and perform the judgment, decree or order of the circuit court.

Ark. R.App. P.-Civ. 8(c) (2009). The purpose or effect of a supersedeas bond is to secure the payment of a judgment following its affirmance on appeal. *See Bailey v. Delta Trust & Bank,* 359 Ark. 424, 198 S.W.3d 506 (2004); *Ryder Truck Rental, Inc. v. Sutton,* 305 Ark. 374, 807 S.W.2d 909 (1991). Rule 8(c) affords the court sufficient discretion to marshal security, so long as security remains the ultimate goal. We have further held that the bond must be sufficient in amount to guarantee that the appellant will pay the appellee "all costs and damages that shall be affirmed against appellant on appeal." *Bailey,* 359 Ark. at 440, 198 S.W.3d at 518 (quoting *Schramm v. Piazza,* 53 Ark. App. 99, 100, 918 S.W.2d 733, 734 (1996) (per curiam)). In other words, we have consistently recognized the purpose of a supersedeas bond to be securing the payment of a judgment following affirmance on appeal. *Id.,* 359 Ark. 424, 198 S.W.3d 506; *see also Sutton,* 305 Ark. 374, 807 S.W.2d 909. Thus, by the plain language of the rules and our caselaw addressing them, neither Rule 62 nor Appellate Rule 8 are applicable to this case. JMFH did not have a judgment against Sims. Sims owed JMFH nothing. It was Sims who sought to prove a claim against JMFH.

Moreover, this court has recognized that a supersedeas bond is not appropriate

in the absence of a judgment. *Beverly Enters.-Ark., Inc. v. Cir. Ct. of Independence County,* 367 Ark. 13, 238 S.W.3d 108 (2006). There, this court reversed a circuit court order requiring petitioner to post a supersedeas bond because of its uncertain financial status in the absence of any type of judgment, stating the following:

> When the circuit court granted the request for the supersedeas bond under Rule 8, there was no judgment for monetary or injunctive relief to be protected by a supersedeas bond. "The purpose or effect of a supersedeas bond is to secure the payment of a judgment following its affirmance on appeal." A supersedeas bond required under Rule 8 is not imposed to protect appellees against alleged financial instability of an appellant prior to an entry of judgment for damages that might never be obtained. In the present case, there was no judgment for damages on which to stay execution. The case is yet to be tried. The circuit court erred in granting the request for a supersedeas bond under Rule 8.

*Id.* at 16, 238 S.W.3d at 110 (citations omitted). Just as a supersedeas bond was not appropriate in *Beverly,* it was not appropriate here. All Sims had was a claim in a dissolution proceeding that was rejected by the circuit court.

Moreover, the circuit court's reliance on *Butt v. Evans Law Firm, P.A.,* 351 Ark. 566, 98 S.W.3d 1 (2003), for the proposition that Sims was not entitled to relief is misplaced. In that case, an intervenor challenged the circuit court's order awarding attorneys' fees in an illegal-exaction suit. This court affirmed the circuit court's award of attorneys' fees, even though they had been improperly calculated and were thus excessive. In so ruling, this court held that the intervenor could not "unravel attorneys' fees" where he took "no steps to stay the order awarding attorneys' fees *or* to post a supersedeas bond." *Id.* at 587, 98 S.W.3d at 13 (emphasis added) (footnote omitted). The circuit court in the instant case concluded pursuant to our holding in *Butt,* that Sims should have obtained a supersedeas bond and his failure to do so prohibited him from challenging the distribution of funds. The circuit court ignored the entirety of our holding in *Butt,* however. We concluded that the intervenor was not entitled to disgorge the already-paid attorneys' fees because he did not post the bond *or* obtain a stay.

In this case, Sims filed a motion requesting a stay of the circuit court's distribution order after the circuit court summarily denied his claim. On February 14, 2006, the claimants, including Sims, collectively filed a motion for reconsideration or new trial, or, alternatively, for a stay of the circuit court's order requiring payment of the other claims. Therein, they specifically requested the circuit court to "stay its order and not to authorize the disposition of any funds held in the registry of the Court until this matter can be heard on appeal." The circuit court, however, never ruled on this motion and it was deemed denied. Sims then sought a writ of certiorari, or alternatively prohibition, in this court, arguing that the circuit court had denied his motion for a stay. This court denied his requested writ, holding that he had an adequate remedy available to him, namely an appeal. *Sims,* 368 Ark. 498, 247 S.W.3d 493. Then, Sims pursued his appeal. Clearly Sims took steps to seek a stay. He could not force the circuit court to rule on his motion to stay, and when the court in fact refused to rule on it, he sought extraordinary relief in this court, which was also denied. Thus, the instant case is distinguishable, as Sims took action and attempted to prevent the distribu-

tion of funds. He did not sit back and do nothing, as did the litigant in *Butt.*

Because the circuit court denied Sims his right to due process on remand by failing to provide him with a meaningful hearing and by incorrectly determining that Sims was barred from seeking relief, we reverse and remand on this point. We note that Sims requests this court to determine what mechanism, i.e., ordering an unwinding of the distributions or ordering actions against the shareholders of JMFH, shall be used to pay his claim. We decline this request, however, as it is not for this court to fashion the appropriate remedy. That is an issue to be addressed by the circuit court on remand.

■■ Sims's final point on appeal is that the circuit court erred in reducing his claim by $40,000 for monies paid by this court's Client Security Fund and by another $16,740 for attorneys' fees awarded to Sims in connection with the Lonoke County judgment that was entered against Moser in his individual capacity. Sims argues that these funds could not be used to reduce his claim as they constituted a collateral source. Fletcher and Holleman argue that the circuit court properly offset Sims's claim, as the collateral-source rule is inapplicable.

■■ The collateral-source rule is a general rule providing that recoveries from collateral sources do not redound to the benefit of the tortfeasor, even though double recovery for the same damage by the injured party may result. *Shipp v. Franklin,* 370 Ark. 262, 258 S.W.3d 744 (2007); *Bell v. Estate of Bell,* 318 Ark. 483, 885 S.W.2d 877 (1994); *Amos v. Stroud,* 252 Ark. 1100, 482 S.W.2d 592 (1972). For the collateral-source rule to apply, the third-

party payment must be wholly independent of the tortfeasor. *Douglas v. Adams Trucking Co., Inc.,* 345 Ark. 203, 46 S.W.3d 512 (2001).

■■ The purpose of the Client Security Fund is to protect clients from losses caused by the dishonest conduct of an attorney. *Healthcare Recoveries, Inc. v. Ark. Client Sec. Fund,* 363 Ark. 102, 211 S.W.3d 512 (2005). Here, the Client Security Fund paid to Sims $40,000 as a result of Moser's misdeeds. In receiving those funds, Sims had to sign an indemnity agreement promising to repay those funds if a judgment against Moser was ever obtained. Thus, the Client Security Fund was wholly independent and the funds it paid to Sims constituted a collateral source. Accordingly, it was improper for the circuit court to reduce Sims's claims by $40,000.

■■ We now consider the $16,740 paid as a result of an order of the Lonoke County Circuit Court regarding outstanding attorneys' fees owed by Moser.[4] The judgment that Sims obtained in Lonoke County was against Keith Moser, Moser & Associates, and JMFH, jointly and severally. In addition, the Lonoke County Circuit Court awarded Sims attorneys' fees in the amount of $14,062.76, an amount that with interest now totals $16,740. After Moser received a distribution as part of the dissolution, Sims executed a writ of garnishment and received a payment of $45,140.45. From that payment, Sims allocated $16,740 of the money to cover attorneys' fees, with the remaining funds attributed to Sims's claim against JMFH. Sims now argues that these funds were a collateral source as well, because the judgment he obtained was against Moser and

4. The actual amount allocated for attorneys' fees was $16,735.45, but the circuit court rounded up that sum to $16,740.

JMFH jointly and severally, so that they were each liable for the entire judgment owed. We disagree with Sims. Regardless of the nature of the judgment he obtained, the fact remains that the money allocated for attorneys' fees came from a garnishment of Moser, who was the tortfeasor. Thus, the funds were not from a wholly independent source, and the circuit court properly offset the judgment by the amount of $16,740.

### Fletcher's Cross–Appeal

█ Fletcher argues on cross-appeal that the circuit court erred in approving Sims's claim in the absence of any proof supporting that claim. Fletcher argues that the circuit court ruled as a matter of law that the default judgment obtained by Sims in Lonoke County Circuit Court supported the claim without any further proof. According to Fletcher, Sims's judgment was based on an allegation that Moser assisted in a wrongful transfer of real property valued at $650,000 and belonging to Sims and that this money was deposited in JMFH's trust account. Fletcher argues that this transaction occurred after the dissolution date of JMFH and thus his documents on their face establish no claim against JMFH. Sims counters that the circuit court properly accepted the default judgment that was obtained against JMFH and was not required to look beyond that judgment. Sims is correct.

At the hearing upon remand, Fletcher moved for a directed verdict on the claim of Sims's, arguing as follows:

Your Honor, we move for a directed verdict on the claim of Michael Sims. There's been no proof of his claim. He has submitted judgments. There's no testimony about what his claim was against JMFH, whether JMFH did anything to warrant the payment of any JMFH assets to him.

The default judgment is not a claim. It does not satisfy the requirements for the claim under the dissolutions statutes. There's been a failure of proof in that regard, so we move for a directed verdict on Sims' claim.

The court ultimately denied the motion, allowing Sims's claim, minus the deductions of $40,000 representing payment to Sims by the Client Security Fund and the $16,000 amount paid by Moser for attorneys' fees.

█ There is no merit to Fletcher's argument on cross-appeal. First, Fletcher fails to cite any authority in support of his argument that Sims failed to prove his claim. This court may refuse to consider an argument where appellant fails to cite any legal authority, and the failure to cite authority or make a convincing argument is sufficient reason for affirmance. *See Middleton v. Lockhart*, 344 Ark. 572, 43 S.W.3d 113 (2001).

Moreover, when Sims initially presented his default judgment as a claim in the judicial-dissolution proceeding, the circuit court ruled that it was void ab initio because the Lonoke County Circuit Court lacked jurisdiction to enter an order against JMFH when it had a pending proceeding in Pulaski County Circuit Court. This court reversed that ruling, explaining that there was concurrent jurisdiction under the applicable statutory law. Thus, upon remand, Sims again presented his default judgment by submitting certified copies of records establishing that judgment. That judgment was rendered after JMFH failed to appear and defend; thus, the judgment itself reflects no factual allegations or dates as set forth by Fletcher and was evidence sufficient to support the circuit court's approval of that claim. Fletcher's argument to the contrary constitutes an impermissible collateral attack, as it is an attack on the judgment in any

manner other than by an action or proceeding, whose very purpose is to impeach or overturn the judgment. *See Nationwide Ins. Enter. v. Ibanez*, 368 Ark. 432, 246 S.W.3d 883 (2007).[5] As there is no merit to Fletcher's cross-appeal, the circuit court's denial of his directed-verdict motion should be affirmed.

### *Holleman's Argument*

Lastly, Holleman argues in his brief that the circuit court erred when it deemed Sims's Lonoke County judgment valid as a matter of law because Sims fraudulently obtained that judgment. As any attack by Holleman to the validity of the circuit court's ruling regarding Sims's judgment would be in the nature of a cross-appeal, it was incumbent on Holleman to file a timely notice of cross-appeal. The record reflects that Holleman did file a notice of cross-appeal, but it was untimely. Prior to filing a notice of cross-appeal, Holleman filed a posttrial motion for reconsideration but this motion was not filed within ten days of entry of the court's order; thus, the time for filing an appeal was not extended. *See* Ark. R. Civ. P. 59 (2009) (a motion for new trial must be filed not later than ten days after entry of the judgment). Accordingly, Holleman's purported notice of cross-appeal filed some months after the order was entered was in no way timely, and we are precluded from considering his argument on cross-appeal.

Affirmed as to Jewell; affirmed in part; reversed and remanded in part as to Sims; affirmed as to Fletcher's cross-appeal; dismissed as to Holleman's cross-appeal.

BROWN and WILLS, JJ., dissent part; concur in part.

BROWN, J., dissenting in part and concurring in part.

In a remarkable decision, the majority has remanded this case to the trial court for a second time and held that the Sims Estate (Sims) is entitled to "relief" on its claim and that the trial court should "fashion the appropriate remedy." The remedy Sims wants, based on the 2008 hearing before the trial court, is to unwind a distribution of money to the law firm partners (partners) that occurred more than three years ago and to require a disgorgement of those assets so that Sims's claim may be satisfied. The trial court, of course, has already refused to do this in its order dated December 9, 2008, because Sims never obtained a supersedeas bond to preserve the status quo and protect the partners. Yet, the majority remands this case a second time with the clear signal that the "appropriate remedy" is to require the partners to satisfy Sims's claim. Because of the far-reaching implications of the majority opinion and because the opinion is wrong in several fundamental respects, particularly with regard to the law of supersedeas bonds and law of the case, I dissent.

*a. Failure to Obtain a Stay or Appeal the Denial of a Stay by the Trial Court*

Sims's most serious error throughout this litigation has been his failure to pursue a stay of the distribution of assets to the partners before it occurred or to pursue post-distribution relief such as a mandatory injunction after it occurred. Nor did he ever appeal the denial of a stay by the trial court in 2005. The failure of Sims to obtain a stay was central to the

---

**5.** Fletcher and the others previously sought to have the default judgment set aside in Lonoke County Circuit Court and were unsuccessful.

trial court's decision to deny relief, as set out in its order of December 9, 2008:

7. The Court denies Sims's request, made in a 'bench memorandum' filed October 30, 2008, and requested at the hearing, to "unwind" the previous Court orders dated December 29, 2005, and February 3, 2006, authorizing shareholder distributions. Sims did not seek or obtain a stay of enforcement of those judgments or post the necessary supersedeas prior to the previous appeal of the Court's decisions as would be required by Rule 62, Ark. R. Civ. P., and Rule 8, Ark. R.App. P.-Civ. *Butt v. Evans Law Firm, P.A.*, 351 Ark. 566, 98 S.W.3d 1 (2003).

### b. Failure to Post Supersedeas Bond

Hand in hand with his failure to obtain a stay was the fact that Sims never posted a supersedeas bond to support a stay of the distribution to the partners. Based on his own testimony to the trial court and in pleadings to this court, he did not do so because he could not afford a bond. Witness this colloquy in October 2008:

CIRCUIT JUDGE: Why was there no supersedeas in this case? Why was there no appellate review?

ATTORNEY FOR SIMS: Your honor, the only answer I can give you is Mr. Sims had no assets. Everything he had was taken.

Indigency is not a defense to failure to post a bond to preserve the status quo. *See Rudolph v. Cassidy*, 225 Ark. 951, 286 S.W.2d 489 (1956). As quoted above, failure to obtain this bond was a pivotal reason the trial court gave to deny Sims relief on remand. Yet the majority holds that a bond was not required.

In a serious error, the majority holds that the need to post a supersedeas bond is limited *only* to cases where a defendant seeks to appeal a judgment and halt execution against his or her assets during the appeal. Apart from the fact that Sims did not raise this point until his reply brief, which we have consistently ruled is too late (*see, e.g., Farm Bureau Mut. Ins. Co. v. David,* 324 Ark. 387, 921 S.W.2d 930 (1996)), such a narrow interpretation of the supersedeas requirement has never been the law in Arkansas. Indeed, the holding will cause a sea change in the supersedeas law of this state.

A prime example of the majority's error on this point is *Wayne Alexander Trust v. City of Bentonville,* 345 Ark. 577, 47 S.W.3d 262 (2001). In *Wayne Alexander Trust,* we denied an appellant's request for a stay of a circuit court order approving a municipal ordinance and requiring the condemnation of seven buildings in Bentonville because he had failed to file a supersedeas bond as required under Rule 8 of the Arkansas Rules of Appellate Procedure—Civil. A second recent example is *Breckenridge v. Givens,* 344 Ark. 419, 39 S.W.3d 798 (2001). In that case, we granted an attorney's request for a stay of his three-month disciplinary suspension pending appeal provided that he post a $5,000 supersedeas bond to cover the cost of the appeal. Neither situation involved a defendant attempting to halt an execution on assets.

Our case law is replete with other examples where this court and trial courts required supersedeas bonds in matters not involving the need to secure the payment of a judgment following appeal. *See, e.g., First Nat'l Bank of Izard County v. Arkansas State Bank Comm'r,* 301 Ark. 1, 781 S.W.2d 744 (1989) (bank required to post a supersedeas bond for a stay pending appeal of a circuit court order approving a competitor bank's application to establish a new bank branch); *Jones v. Carney,* 264 Ark. 405, 572 S.W.2d 585 (1978) (supersedeas bond posted to

keep liquor store open pending appeal of circuit court order reversing the Alcoholic Beverage Control Board's approval of appellant's permit application); *Duncan v. Crowder*, 232 Ark. 628, 339 S.W.2d 310 (1960) (supersedeas bond posted in a child-custody case where appellants sought to stay pending appeal an order directing them to deliver custody of child to appellee); *Bradley v. Jones*, 227 Ark. 574, 300 S.W.2d 1 (1957) (supersedeas bond posted in election contest for a stay pending appeal of the certification of the election).

As these cases graphically illustrate, supersedeas bonds are often necessary to protect the interests of non-appealing parties in cases other than those involving the scenario of an appeal following a money judgment against the appellant. Take for example the *First Nat'l Bank of Izard County* case. There, First National Bank of Izard County appealed a decision of the State Banking Commissioner granting a competing bank, the Bank of North Arkansas, a permit to establish a branch bank in Calico Rock, which was the location of First National Bank's principal bank. First National Bank was allowed to stay the decision pending appeal but was required to post a supersedeas bond to protect Bank of North Arkansas's potential economic loss occasioned by the delay.

The fallout from today's decision is obvious. The ability of the trial courts of this state to require supersedeas bonds to maintain the status quo and to protect the interests of non-appealing parties henceforth will be severely curtailed.[6]

Other courts have been equally vocal about the need for a bond to preserve the status quo. As an initial matter, Sims is correct that a stay of proceedings and a supersedeas bond are not required in order to appeal. *See* Ark. R.App. P.-Civ. 8; *Lytle v. Citizens Bank of Batesville*, 4 Ark. App. 294, 630 S.W.2d 546 (1982). But "a party who chooses to appeal but who fails to obtain a stay or injunction pending appeal risks losing its ability to realize the benefit of a successful appeal." *In re Combined Metals Reduction Co.*, 557 F.2d 179, 188 (9th Cir.1977) (quoting *In re Lewis Jones, Inc.*, 369 F.Supp. 111, 115–16 (E.D.Pa.1973)); *see also Duncan v. Farm Credit Bank of St. Louis*, 940 F.2d 1099 (7th Cir.1991) ("an appellant may elect to forego Rule 62 protection, but does so at his or her own peril"); *In re Sugarloaf Props.*, 286 B.R. 705, 710 (Bankr. E.D.Ark.2002) ("a party has no other protection from the enforcement of an order unless he or she files a supersedeas bond and requests a stay pending appeal under Rule 62(d)"); *Mann–Stack v. Homeside Lending, Inc.*, 982 So.2d 72 (Fla.App.2008) (order of disbursement following foreclosure sale was appropriate despite the fact that the foreclosure judgment was on appeal where appellant failed to post supersedeas bond or obtain a stay of an order of disbursement following the foreclosure sale); *Butt v. Evans Law Firm*, 351 Ark. 566, 98 S.W.3d 1 (2003); *Freeman v. Wintroath Pumps–Division of Worthington*

---

**6.** Consider also the scenario involved in *Arkansas Electric Energy Consumers v. Arkansas Public Service Commission*, 31 Ark. App. 217A, 791 S.W.2d 719 (1990) (denying appellant's request for stay pending appeal). There, the appellant, an association of large customers of Arkansas Power and Light Company (AP & L) sought to stay pending appeal an order of the Arkansas Public Service Commission allowing AP & L to transfer its ownership interests in an electric station. AP & L alleged that it would have been harmed to the extent of nearly $2 million per month for each month the sale was delayed in addition to losing interest expense based on its inability to pay off bonds with the proceeds of the sale. Under the majority's analysis, supersedeas bonds will no longer afford protection to parties, such as AP & L, who suffer the risk of economic loss due to stays pending appeal.

*Corp.*, 13 Ariz.App. 182, 475 P.2d 274 (1970) ("The appellant who fails to post a supersedeas bond runs the risk that upon reversal the funds will have been dissipated."); *Michigan Bean Co. v. Burrell Engineering & Constr. Co.*, 306 Mich. 420, 11 N.W.2d 12 (1943) (appellant's failure to post a supersedeas bond on appeal did not preclude it from appealing, but it did subject itself to the risk of having a writ of execution issued during the pendency of the appeal).

The majority's attempt to distinguish our holding in *Butt v. Evans Law Firm*, 351 Ark. 566, 98 S.W.3d 1 (2003) fails the test of reasonableness. According to the majority, this court concluded in *Butt* that "the intervenor was not entitled to disgorge the already-paid attorneys' fees because he did not post the bond or obtain a stay." Yet, somehow the instant case, in which Sims never posted a bond or obtained a stay, is different. The difference, the majority concludes, is that the litigant in *Butt* took no action to obtain a stay or post a bond whereas Sims "took steps to seek a stay." The majority apparently believes that it was the litigant's failure *to attempt* to post a supersedeas bond or obtain a stay, rather that the litigant's failure to actually obtain a stay or post a supersedeas bond, that was essential to our holding in *Butt.* The majority goes on to note that Sims filed a motion for stay in the circuit court but that it could not force the circuit court to rule on it. Essentially, the majority believes that there was nothing more Sims could have done to obtain a stay. I disagree.

*c.  Opportunities for Sims to Obtain a Stay*

A review of the facts illustrates my point. Sims's claim against the partners was denied by the circuit court on December 29, 2005. On January 27, 2006, he filed his petition for an extraordinary writ with this court and sought a stay. His petition showed that he was well aware of the need for supersedeas relief, because he argued that an appeal would not be an adequate remedy in that he could not afford to post the necessary supersedeas bond to stay the distribution of the corporation's assets.

On February 3, 2006, the circuit judge ordered the distribution of the funds, and this court granted Sims a temporary stay of that order. On February 14, 2006, Sims moved for reconsideration or alternatively a motion for a permanent stay of the trial court's order of disbursement. He did not post a supersedeas bond. Again, Sims was well aware of the danger of not obtaining a stay and argued in his brief in support: "If the trial court's order is not stayed pending appeal, and any assets of the corporation are distributed, it is highly likely that those assets will be dissipated before any appeal can be decided by an appellate court. If that happens, and the appellate court reversed this court's judgment, these claimants will be deprived of a meaningful opportunity to collect on their claims." The circuit judge never ruled on the motion, and it was deemed denied on March 16, 2006.

On April 26, 2006, Sims appealed the circuit judge's December 29, 2005 order. It was, again, clear that he could not afford a supersedeas bond to protect the appellees. Sims reiterated that point in his brief filed on March 27, 2006, in support of his petition for certiorari, prohibition, and a stay before this court. In our opinion denying that petition on November 30, 2006, we said:

> [Sims] argues … that he cannot afford a supersedeas bond if one is required after an unfavorable judgment mandating the disposition of funds. But what *may* happen in the Pulaski County

Circuit Court on this matter in the future amounts to crystal-ball gazing and this court will not engage in such. Accordingly, as matters stand today, we hold that Sims has an adequate remedy available to him in the form of a direct appeal. . . .

In short, Sims knew as early as November 30, 2006 that his petition for a stay was denied and his remedy was an appeal. He also knew that he should ask for a stay from the circuit judge and that a supersedeas bond would, in all likelihood, be required. Also, on November 30, 2006, this court dismissed Sims's direct appeal for lack of a final order. *See Sims v. Circuit Court of Pulaski County,* 2006 WL 3446383. A substitute opinion, adding one sentence not relevant to the current appeal, was handed down by this court on January 18, 2007. *Sims v. Circuit Court of Pulaski County, supra.* That is the date the circuit court ordered distribution of the funds to the partners. Sims was aware of that order and yet he never appealed the wrongful denial of his request for a stay as grounds to unwind the distribution. Nor did Sims seek an immediate mandatory injunction from the circuit judge to reverse the distribution.

On August 1, 2007, the circuit judge entered a final, appealable order. On August 28, 2007, Sims appealed from the December 29, 2005 order. Again, Sims did not appeal the denial of his motion to stay. On May 22, 2008, this court reversed the circuit judge's order and found that Sims was denied due process in the absence of a hearing on his claim, which still had not been approved. We remanded the case for a hearing to determine whether Sims's claim was valid.

Several months later, in his brief before the circuit judge prior to the hearing on remand held on October 31, 2008, Sims asked that the distribution on January 18, 2007, be "unwound." This is the first time that Sims broached the issue of unwinding the distribution to the circuit judge. As already stated in this opinion, the circuit judge refused to do this due to Sims's earlier failure to renew the motion to stay and post a supersedeas bond. The following colloquy at the hearing is instructive:

CIRCUIT JUDGE: So I've been back through I think the entire file . . . preparing for this hearing. There was a pleading that was filed on February 14th of 2006, over two and a half years ago. Several of the claimants I believe joined in a request that, in the alternative, that any distribution be stayed pending appeal . . . I find nothing else in the file about anybody attempting to request a hearing, put on testimony or evidence, utilize any supersedeas, take any action of any nature whatsoever. So in the file, what have I missed?

. . . .

ATTORNEY FOR THE SIMS ESTATE: Well, your honor, if you go back to November 8th of 2005 and the subsequent orders that were entered shortly thereafter, those claims were provided with due process, they received their money. The Supreme Court has said that my client did not receive due process, that he was denied due process because he was not afforded a hearing on his claim.

. . . .

As far as what is in the record, your honor, we were present on November 8th, and we were—and I believe that if you look at the record of the appellate court and the record from this court, I asked to present my claim at that hearing. I said, I am ready, willing, and able—

CIRCUIT JUDGE: You're not answering my question now . . . What did you do

about supersedeas that was available to you under the Rules of Civil Procedure, Rules of Appellate? When did you ask the appellate court to stop any distribution?

ATTORNEY FOR THE SIMS ESTATE: Your honor, I filed a writ of certiorari.

CIRCUIT JUDGE: And they denied that.

ATTORNEY FOR THE SIMS ESTATE: And they denied that.

CIRCUIT JUDGE: And, in fact, I believe they mentioned the fact that supersedeas, there was some |36comment about that perhaps it could be requested or something, right?

So they denied the writ of cert. And then monies were distributed. Monies had been distributed actually to your client and to you as well. People are no longer at this table who were at the table.

. . . .

What does Arkansas case law say in situations like this where supersedeas is not requested and is not posted and things move on down the road for two and a half years?

ATTORNEY FOR SIMS ESTATE: Your honor, I've looked for that. I cannot give you an answer. I haven't found anything on point. I've looked at treatises.

. . . .

CIRCUIT JUDGE: Why was there no request for a supersedeas in this case? Why was there no appellate review?

ATTORNEY FOR SIMS ESTATE: Your Honor, the only answer I can give you is Mr. Sims had no assets. Everything he had was taken.

To summarize, before his death Sims was aware of his remedy, but (1) he never appealed the denial of his request for a stay, which occurred on March 16, 2006, although he had the opportunity to do so;

(2) he failed to petition the circuit judge to unwind the distribution of JMFH's assets following the January 18, 2007 order until October 31, 2008; (3) he never petitioned this court, following our opinion on May 22, 2008, for rehearing on |37the basis that this court should address the unwinding issue, if his claim was approved by the circuit judge; and (4) he admitted on the record that he could not afford a supersedeas bond and never obtained a stay. Simply put, under established precedent Sims's failure to obtain a stay or to post a supersedeas bond precludes the relief provided by the majority opinion.

The majority opinion places the blame for Sims's inability to recover the distributed assets on every party but the party most responsible, that is, Sims himself. The circuit court is blamed, even though its orders of distribution were not erroneously entered in the absence of a stay of the proceedings. The partners are blamed for not peering into the future and forestalling legal arguments on matters that had yet to arise. On the other hand, Sims is rewarded for an aborted attempt to obtain a stay and supersedeas bond that would have prevented this problem from the start.

### d. Expansion of the Doctrine of Law of the Case

Not only does the majority err on Sims's obligation to post a supersedeas bond to maintain the status quo, but it inexplicably contends that the issue of Sims's failure to obtain a stay or post a bond is foreclosed under the law-of-the-case doctrine "because Fletcher and Holleman [the partners] failed to raise this argument to this court in the 2008 appeal." Why was this an obligation of the partners? This argument also is fundamentally flawed.

The majority opinion in one breath says that this court did not address Sims's request that we order the circuit court to

unwind the previous distributions in the 2008 appeal, because to do so "would have required us to issue an advisory opinion as Sims's claim had not⌊₃₈yet been approved." Yet, in the next breath, the majority states that the law-of-the-case doctrine prevents the partners from arguing that Sims's failure to post a supersedeas bond prevents the circuit court from directing an unwinding because they failed to raise this argument to this court as appellees in the 2008 appeal. In other words, the failure of the partners to make an argument on an issue that was admitted by Sims because he lacked funds to post a bond and was not apposite to the approval of Sims's claim somehow has a preclusive effect under the law-of-the-case doctrine. Using the vernacular, the majority has not "connected the dots" on this issue.

The burden adopted by the majority, today, which is that the *appellees* must forestall an argument that Sims may have reason to make in future litigation, assuming an event occurs in the trial court on remand, is a burden unrecognized in the annals of the law. The majority, understandably, cites no case law for this contention because there is none. Nor does it cite authority for how the law-of-the-case doctrine forecloses the issue of a supersedeas from coming up in the trial court's hearing after remand in October 2008.[7]

The majority today further expands the law-of-the-case doctrine to include inferences and implications. The result is that, after this opinion, the parameters of law of the case will be unduly murky and amorphous. Circuit judges will no longer be able to determine merely from reading an opinion whether an issue is law of the case. Instead, judges will have to⌊₃₉divine from the ether whether this court contemplated another issue being reached upon issuing an opinion. Moreover, litigants must now

be aware that they are required to peer into the future and make preemptive arguments on issues that may or may not arise in the future of the litigation or risk being precluded under the law-of-the-case doctrine from making such arguments in future stages of the proceedings.

To summarize, the majority has clearly concluded that the assets distributed more than three years ago must be repaid or that the recipients somehow be made responsible for Sims's claims. It does so because it says the trial judge should have decided that this court meant it to do much more than simply hold a hearing on Sims's claim. According to the majority, the trial court should have surmised that if the Sims claim was approved, the distribution must be unraveled and "a mechanism to enforce the approved claim" put in place. The result is that this court now requires trial courts on remand to "crystal-ball gaze" about what our opinions mean, even when the opinion does not spell out specific tasks to perform on remand. That places an undue burden on the trial courts in my judgment.

### e. *Due Process*

The majority's decision ultimately rests on its finding that "due process" required the circuit judge to (1) give notice and hold a hearing on Sims's claim, (2) approve the claim, and (3) provide a remedy which necessarily entails an unwinding and disgorging of the prior distributions. This holding finds no support in Arkansas law, which Sims is candid enough to admit in his brief to this court. In fact, the majority has found on its own—it was not cited ⌊₄₀in Sims's brief—one lone citation in support of this holding. *See McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990).

---

**7.** Neither party had anything to say on this particular law-of-the-case issue in briefs before this court on appeal. The majority has plucked this argument out of thin air.

*McKesson Corp.* is a tax case having nothing to do with the issue presented in this appeal. The *McKesson Corp.* court's holding, which required the State of Florida to provide postpayment relief to taxpayers, was couched on the basic principle that a state's exaction of an unlawful tax is a deprivation of property in violation of the Due Process Clause. An essential element of the holding in *McKesson Corp.* was the fact that the procedure put in place by the State of Florida deprived taxpayers of a property interest without giving them any meaningful opportunity to contest the tax. Specifically, Florida law did not provide taxpayers any "predeprivation process" such as the right to bring suit to enjoin imposition of a tax prior to its payment, or by allowing taxpayers to withhold payment and then interpose objections as defenses in tax enforcement proceedings. Rather, Florida law only allowed taxpayers to raise their objections to an illegal tax in a post-deprivation refund action. Accordingly, the Florida Supreme Court's refusal to order a tax refund or any other form of postpayment relief left the taxpayers without a "clear and certain remedy." In short, where the taxpayers were left with no remedy whatsoever, due process required postdeprivation relief.

Here, in contrast, Sims had a clear and well-established means available to protect his interest in the firm's assets throughout this litigation in the form of supersedeas relief. Despite the majority's contention to the contrary, the circuit judge did not deprive Sims of a remedy. Rather, Sims's own failure to obtain a stay or post a supersedeas bond deprived him of an opportunity to collect the full amount of his judgment.

*f. Developing a Remedy at the Appellate Court*

The majority directs the trial court towards a remedy—unwinding/disgorge-ment—that the trial court has already rejected. In effect, the majority is developing and mandating a remedy at the appellate level, which is unique and without precedent. It is also a remedy that defense counsel admits he could find no support for in case law, and a remedy that a plurality of this court rejected in *Butt v. Evans Law Firm*, 351 Ark. 566, 98 S.W.3d 1 (2003). To repeat, here is Sims's counsel's response to the trial court on this point:

> CIRCUIT JUDGE: What does Arkansas case law say in situations like this where supersedeas is not requested and is not posted and things move on down the road for two and a half years?

> ATTORNEY FOR SIMS: Your honor, I've looked for that. I cannot give you an answer. I haven't found anything on point. I've looked at treatises.

For all of these reasons, I dissent on the Sims appeal. I concur, however, with respect to the *Jewell v. Fletcher* appeal.

WILLS, J., joins this dissent.